```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW HAMPSHIRE
```

Joseph Kertanis

    v.                                    Civil No. 14-cv-343-JL
                                            Opinion No. 2016 DNH 082

Georgia-Pacific Gypsum, LLC


**MEMORANDUM ORDER**

In this state-law employment action, the court is asked to decide at the summary judgment stage, as it often is in cases of this type,[1] why the defendant fired the plaintiff. In a number of cases, the summary judgment record is not sufficiently conclusive to permit that decision. In this case, however, it is.

Joseph Kertanis claims that defendant Georgia-Pacific Gypsum, LLC (GP) fired him from GP's Newington, New Hampshire, plant because he was critical of the plant's human resources manager and after he responded to what he perceived to be a co-worker's dangerous work habits. GP claims it fired Kertanis for verbally abusing and harassing the co-worker. This court has diversity jurisdiction over this action between Kertanis, a New Hampshire citizen, and the defendant, an out-of-state corporation. See 28 U.S.C. § 1332(a)(1).

---

[1] See, e.g., Taylor v. eCoast Sales Sol., 35 F. Supp. 3d 195, 196 (D.N.H. 2014).

Before the court is GP's motion for summary judgment, in which it argues that the undisputed record lacks any evidence of either the bad faith or the public policy rationale necessary to support Kertanis's claims. After oral argument and review of the parties' submissions, the court finds that the undisputed facts show that GP fired Kertanis because he verbally abused the co-worker, an action that public policy does not condone. GP's motion is therefore granted.

## I. **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial. See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)). A fact is "material" if it could sway the outcome under applicable law. Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).

In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party." Id. The court will not credit conclusory allegations or speculation. See Meuser, 564

F.3d at 515; Sea Shore Corp. v. Sullivan, 158 F.3d 51, 54 (1st Cir. 1998). With this standard in place, the court turns to the facts of the case, highlighting only those necessary to the resolution of the instant motion.

## II. Background facts

Kertanis started working there at GP's Newington plant in September 1998. The plant produces wall board and drywall by processing raw gypsum ore. Kertanis filled a variety of roles at the plant during his time there.[2] At the time of his termination, Kertanis was working an overnight (11:00 PM to 7:30 AM) shift.

Production employees such as Kertanis at the Newington plant work on self-directed teams without direct supervisors. Each team is responsible for assigning work to its members, ensuring quality standards and managing all other aspects of the team's performance. Some team members act as "coordinators" responsible for certain administrative functions, including human resources, safety, environmental, quality, and business. The Newington plant also has a Resource Team which consists of management-level

---

[2] According to GP, Kertanis committed several disciplinary and safety infractions between 2002 and 2011, including use of a racial epithet in reference to Martin Luther King, Jr., Day and responding to a co-employee's question by saying "you can't f*cking read." GP does not claim that these past incidents played a role in Kertanis's termination.

employees overseeing production and other aspects of the business.  Finally, the Newington Plant has a Plant Management Team ("PMT") that typically consists of the Plant Manager, the Human Resources Manager, and other management personnel.  Each production team is responsible for addressing employee discipline issues.  When an employee discipline issue arises, the employee's team meets to discuss the issue.  The team then decides on the disciplinary action to be taken.  Most discipline, including verbal or written warnings, can be issued by the team.  If the team believes an employee should be terminated, the team's recommendation is forwarded to the PMT for consideration.  The PMT can affirm, reject, or modify the team's recommendation.  At the time relevant to this litigation, Kertanis was working on Team 3.

GP Hired Nick Philbrook as a machine operator in October 2010.  Philbrook was soon working on Team 3 with Kertanis, Team 3 human resources coordinator Jim Michalski, and the team's production coordinator, Shane Stevens.  The trio was responsible for training Philbrook.  Initially, Philbrook performed well.  According to Kertanis, however, Philbrook's performance began faltering in January 2011, when he began working the overnight shift.  After discussion with Philbrook, Kertanis determined that Philbrook was having sleep issues that interfered with his work.

On January 4, 2011, Philbrook was disciplined. Eventually, Philbrook's training on all equipment other than the forklift was suspended. As a result, Team 3 workers were questioning whether Philbrook would have to be transferred to a different area within GP.

Meanwhile, in March 2011, Kertanis got into a dispute with the plant's human resources manager, Sandra Heald, over unrelated issues that involved neither Philbrook nor safety concerns: the firing of a manager and the later re-hiring of an employee whom Kertanis believed was ineligible for re-hire. When Kertanis raised these issues with Heald, she told him that he "should look for work elsewhere" if he didn't approve of or didn't think he could work with the re-hired employee. He took this as a threat to his job.

On May 10, 2011, Kertanis was criticized about Team 3's failure to report an environmental issue, something that fell within Kertanis's bailiwick, but about which he had no information. Philbrick later told Kertanis that he had reported the incident to someone else, who told him to manipulate a recording device so that the machine in question appeared to be operating normally. Believing Philbrook's actions to be improper Kertanis felt it was necessary to stress the importance of the correct procedures. After receiving unsatisfactory responses

from Philbrook and perceiving that Philbrook was still suffering from sleep deprivation issues, Kertanis, consistent with company procedures, undertook a "counseling" session with Philbrook in an effort to stress the need to perform better at his job. He did so the next day. Kertanis states that he "discussed," "explained," "begged," and "communicated" with Philbrook but believed that Philbrook was not listening to him. Kertanis told him that he would have to turn the matter of Philbrook's performance over to the entire team for consideration.

On the same day, Philbrook informed Michalski that Kertanis had long been yelling and swearing at him and belittling him, and that he no longer wanted to work at GP due to Kertanis. For his part, Kertanis admits to yelling at, and probably swearing at, Philbrook in the final counseling session.[3] After a team meeting on May 12, Michalski and Stevens told Kertanis that Philbrook was going to quit as a result of Kertanis's treatment, that Kertanis should "lighten up" on him, and that he should apologize tp Philbrook. Kertanis did so. In a declaration submitted by GP, Philbrook stated that Kertanis has been verbally abusive towards him in the past, and that he did not believe Kertanis's behavior would change.

---

[3] Philbrook's declaration does not mention this confrontation, but instead focuses mostly on Kertanis's treatment of him generally.

On May 13, 2011, Heald was informed that Philbrook was unhappy over the treatment he received from Kertanis. Unable to locate Michalski or Stevens, Heald spoke directly to Philbrook who admitted to being upset. He told Heald that working with Kertanis was "unbearable" and that he yelled and swore at Philbrook regularly, including on one occasion earlier that same week when Philbrook was performing a new task, and when he looked to Kertanis for guidance ("like a deer in the headlights," according to Kertanis), Kertanis asked, "what the f*ck are you looking at me for[?]" and then soon after, "what the f*ck are you doing[?] [L]ook at me. You don't know what the hell you're doing."[4]

Philbrook told Heald that he had spoken to Michalski about Kertanis's treatment and that he was aware that Michalski and Stevens had spoken to Kertanis about it. Despite the apology, Philbrook explained to Heald he did not believe that Kertanis's post-apology behavior would change. Following her conversation with Philbrook, Heald spoke with Michalski about the situation between Kertanis and Philbrook. Michalski told her that he and Stevens spoke to Kertanis about the way he was treating Philbrook. Michalski also informed Heald that Philbrook told him

---

[4] This was the only specific instance Philbrook recounted in his declaration.

that he did not want to come into work because of the way Kertanis had been treating him and that he was concerned that Philbrook was going to quit. Michalski told Heald that Kertanis's behavior had been going on "forever" and that he recalled Kertanis treating him that way, and that Kertanis had also treated Stevens badly. Michalski said that the issue wasn't brought to the attention of the whole team because he and Stevens thought that it would only make the situation worse.

Heald was sharply critical of their "apology only" approach. She asked Michalski if he believed the plaintiff should be allowed to treat people the way Philbrook described, and Michalski said, "No." She also told Michalski that she believed that Kertanis's conduct required more action by the team. At Heald's suggestion Michalski called her on Sunday, May 15, before the team reported to work for the week. Michalski said he would talk to Stevens and report back.

Later that night Stevens called Heald to discuss the situation. He apologized to the organization on behalf of the team. Stevens stated that he spoke with Michalski and initially believed that they handled the situation appropriately, but that upon reflection, he had come to the opposite conclusion and apologized to the organization. Stevens told Heald that the plaintiff's conduct was not appropriate and should not be allowed

to continue because he believed Kertanis's conduct violated GP's Code of Conduct and Guiding Principles.  Stevens also told Heald that every major issue with which the team dealt was related to Kertanis, and that after a "talking to," Kertanis's behavior would improve but he would eventually slip back into his old ways.  He conceded that this issue should have been brought to management earlier and agreed that they would handle this as a team on Sunday night.  Stevens told Heald that they would send the plaintiff home and would inform him that he is to come in Monday morning to meet with the PMT.  Stevens stated that the Team would address Kertanis's conduct and that Michalski would speak with Heald on Monday morning and present the Team's recommendation for the PMT's consideration.  He expressed his belief that Kertanis should be terminated.  Heald did not explicitly tell Michalski or Stevens that she believed Kertanis should be terminated.

Michalski called Kertanis at home and told him that he was going to be suspended on Sunday, May 15, 2011, and that there would be a meeting with the PMT on Monday.[5]  Kertanis testified that while Michalski did not tell him why, he assumed it had to do with the incident with Philbrook.

---

[5] It was the practice at the Newington plant to suspend employees involved in a significant disciplinary situation pending a resolution.

Team 3 met on May 15 to discuss Kertanis's conduct towards Philbrook. After determining that he violated GP's Guiding Principles of respect, integrity and compliance, Team 3 voted to recommend Kertanis's termination.[6]

Prior to the PMT meeting on Monday, May 16, 2011, Heald spoke with her supervisor, Robert Wolfe, Senior Human Resources Director, about Philbrook's allegations and the possibility of terminating the plaintiff's employment. Heald needed approval from Wolfe (and the PMT) prior to terminating any employee. Given Philbrook's allegations, Wolfe agreed that Kertanis's conduct was grounds for termination. The PMT, consisting of Heald and two other plant managers, met on May 16, 2011, to consider Team 3's recommendation. Michalski and Kertanis also attended the meeting. Kertanis asked the PMT to reconsider the decision to terminate him.

The PMT determined that the plaintiff had violated various GP Guiding Principles. Accordingly, the PMT upheld Team 3's

---

[6] Michalski summarized the team's decision in a memorandum to the PMT, stating, "Team 3 met regarding the recent issues with Joe Kertanis. We learned last week that Joe was harassing one of our new employee's [sic]. He had done this on numerous occasions. Joe was not following our guiding principles. Respect/Integrity/Compliance. Team 3 decided that as a senior member of Team 3 Joe is well aware of his expectations as a Newington employee. He has demonstrated non-compliance, we as a team can not tolerate. We have voted to recommend termination at this time. Team 3."

decision and terminated Kertanis's employment, effective May 16, 2011.  Kertanis signed an Exit Form that listed his "Reason for Leaving" GP as "Termination due to violation of Code of Conduct & Guiding Principles."

### III.  **Legal Analysis**

1. Wrongful termination

In order to prevail on a wrongful termination claim under New Hampshire law, "a plaintiff must establish two elements: one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that . . . the employment [was terminated] because the employee performed acts which public policy would encourage or . . . refused to perform acts which public policy would condemn."  Short v. School Admin. Unit No. 16, 136 N.H. 76, 84 (1992) (citing Cloutier v. A & P Tea Co., Inc., 121 N.H. 915, 921–22 (1981)).  "[O]rdinarily the issue of whether a public policy exists is a question for the jury, [but] at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law."  Id.

Bad faith or malice on the part of an employer requires evidence that (1) an employee is discharged for pursuing policies condoned by the employer, (2) the record does not support the stated reason for the discharge, or (3) disparate treatment was

administered to a similarly situated employee.  See Cloutier, 121 N.H. at 921-22.

Kertanis argues that Heald's role in his termination was motivated by malice and retaliation in response to his earlier criticism of Heald regarding the resignation of a plant manager and the re-hiring of a co-worker.  As explained below, however, even assuming that the record evidence creates a genuine issue as to whether Heald acted with bad faith or malice,[7] Kertanis's claim fails on the "public policy" element.

The court begins by noting that Kertanis's claims are not a model of clarity.  The operative complaint, filed pro se, is unclear as to the public policy rationale undergirding the lawsuit.  Later represented by counsel, Kertanis's objection to summary judgment and oral argument helped bring the issue into focus, although the precise contours of his claim remained somewhat of a moving target.

Assessing the totality of his filings and oral argument, Kertanis suggests two public policy rationales in support of his wrongful termination claim.  First, that GP's unusual management

---

[7] Specifically, the court assumes that a rational jury could find that Heald became involved in Kertanis's termination as retaliation for his questioning her decision-making in regard to the fired and re-hired employees.  Moreover, such questioning by Kertanis could be seen as consistent with GP's team-based-management, i.e., he was pursuing a policy condoned by GP. Cloutier, 121 N.H. at 921-22.

structure – a "self-regulated workplace" where employees also serve as managers – fosters a public policy that would encourage him to speak out to Heald as he did.  Second, that his interactions with Philbrook were to ensure plant safety, a goal that public policy would encourage.  The court addresses these in turn.

Kertanis claims that "[i]t is against public policy to require employee/member participation in the management process yet subject them to termination for doing a required act."  (Doc. no. 28-1 at 17).  However, he has cited no authority (nor provided any at oral argument) that recognizes such a public policy, or even, more generally, a public policy favoring any sort of management structure or an employee's involvement in it.  See Short, 136 N.H. at 85 (holding that "an employee's expression of disagreement with a management decision is not an act protected by public policy").[8]  That Kertanis may have been following a policy GP condoned has no bearing on the public policy analysis.  Company policy and public policy are neither factually nor conceptually identical.  "[T]he first prong [of the

---

[8] To the extent that Kertanis is arguing that GP's alleged non-compliance with an employee handbook can support a cause of action, he is mistaken.  See Gavin v. Liberty Mut. Group, Inc., 2012 DNH 154, 20 (holding that allegations of employer's failure to follow internal policies does not implicate a "public policy" within the context of a wrongful termination action), citing MacKenzie v. Linehan, 158 N.H. 476, 481 (2009).

wrongful termination burden of proof] focuses on the nature of the employer's actions," Duhy v. Concord Gen. Mut. Ins. Co., 2009 DNH 074, 27 (citations and punctuation omitted), while the second prong "focus[es] on the acts of the employee and their relationship to public policy, not on the mere articulation of a public policy by the employee." Frechette v. Wal-Mart Stores, Inc., 925 F. Supp. 95, 98 (D.N.H. 1995).

Next, to the extent that Kertanis argues that he was terminated for trying to address safety concerns with Philbrook, there is no record evidence from which a reasonable jury could conclude that his safety advocacy played any role in GP's decision. Even if the summary judgment record permits the inference that Kertanis's indisputably rough verbal treatment of Philbrook was motivated by his interest in plant safety, he concedes that his final (and ultimately termination-triggering) discussion with Philbrook was unrelated to safety. He also does not dispute either that the specific instances related above actually happened or that his treatment, in general, could be seen as "overbearing" and "overzealous" and, at least on the final occasion, required an apology.[9]

---

[9] Kertanis disputes the characterization of his treatment as "bullying" or "harassing," but not that the verbal confrontations occurred. To the extent he argues that GP should have weighed his conduct differently, the court borrows from federal anti-discrimination law to point out that it is not "a super-personnel

All of plaintiff's putative public policy theories also suffer from a similar flaw.  New Hampshire law suggests that no public policy supports mistreating a co-worker, even in the pursuit of a an appropriate concern.  In Leeds v. BAE Systems, 165 N.H. 376 (2013), the plaintiff was discharged for using "abusive or threatening language" following a traffic confrontation in which he mistook the other driver's cellphone for a gun.  Id. at 377.  After the trial court granted summary judgment in the defense's favor, Leeds argued that a jury should have been allowed to determine whether public policy supported action he described as "self-defense".  In rejecting the argument, the Court said:

> Whether the other driver was the primary aggressor and whether Leeds mistook the cell phone for a gun, are immaterial considerations.  Even assuming, without deciding, that Leeds's contact with the cell phone was an act of self-defense in response to unprovoked aggression, the remainder of his conduct on company property was not self-defense. We therefore hold, as a matter of law, that public policy neither encourages Leeds's actions nor favors them over BAE's policy prohibiting abusive language and behavior in the workplace.  See Short, 136

---

department that reexamines an entity's business decisions." Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 35 (1st Cir. 2012) (internal quotation marks omitted); see also Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir.2000) ("[T]he question is not whether [plaintiff] was actually performing below expectations, but whether [his employer] believed that []he was.")

> N.H. at 84–85, 612 A.2d 364 (holding, as a matter of law, that loyalty to one's supervisor "does not form the basis of a public policy because a countervailing public policy supports the [employer's] exercise of its employment and management responsibilities").

Id. at 380 (emphasis added).  In other words, although there can be no question that public policy would encourage employees from protecting themselves from workplace violence (indeed, criminal laws codify self-defense), that same public policy does not countenance doing so in an abusive way and does not negate an employer's right to maintain workplace standards of behavior and terminate employees who violate them.[10]

So it is here.  As in Leeds, the court finds that no public policy supporting workplace safety or participation in a "self-managed workplace" requires an employer to condone the purported furtherance of such a policy through abusive disrespectful conduct toward co-workers.  Accordingly, GP is entitled to summary judgment on Kertanis's wrongful termination claim.

---

[10] Kertanis's summary judgment objection also contains a sentence or two concerning the public policy of permitting more senior employees to "teach and train new employees."  However, even if such a public policy exists, a proposition that Kertanis has not substantiated through briefing or argument, Kertanis's memorandum of law concedes that the process of teaching "should not be interfered with <u>absent abuse or harm</u>."  (Doc. no. 28-1 at 18).  Here, Kertanis's verbal abuse of Philbrook is uncontested, and thus this public policy argument is unavailing.

2. Good faith and fair dealing

The court's ruling on Kertanis's wrongful termination claim is fatal to his claim that GP violated the implied covenant of good faith and fair dealing by firing him. The same lack of a public policy anchor that undermined the former dooms this one as well. As the New Hampshire Supreme Court noted in Centronics v. Genicom, Inc., "an employer violates an implied term of a contract for employment at-will by firing an employee out of malice or bad faith in retaliation for action taken or refused by the employee in consonance with public policy." 132 N.H. 133, 140 (1989).

IV. **Conclusion**

The undisputed summary judgment record lacks any evidence that Kertanis was terminated for performing an act that public policy would encourage or for refusing to perform an act that would run contrary to public policy. GP's motion for summary judgment[11] is therefore GRANTED. The clerk shall enter judgment accordingly and close the case.

---

[11] Doc. no. 27.

**SO ORDERED.**

/s/ Joe Laplante
_____
Joseph N. Laplane
United States District Judge

Dated: April 19, 2016

cc: Elizabeth B. Olcott, Esq.
    Daniel B. Klein, Esq.
    Jean M. Wilson, Esq.
    Brian L. Michaelis, Esq.